# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| DAVID M. GRECO, individually and on behalf of others similarly situated,<br><br>　Plaintiff,<br><br>　v.<br><br>GURBIR S. GREWAL, New Jersey Attorney General; JARED M. MAPLES, Director, New Jersey Office of Homeland Security and Preparedness; NEW JERSEY OFFICE OF HOMELAND SECURITY AND PREPAREDNESS, a Cabinet Level Department of the State of New Jersey; CAMDEN COUNTY PROSECUTOR'S OFFICE, a municipal entity of the state of New Jersey; JILL S. MAYER, Acting Camden County Prosecutor; NEVAN SOUMILAS, Assistant Camden County Prosecutor; GLOUCESTER TOWNSHIP POLICE DEPARTMENT, a Municipal Entity of the State of New Jersey; BERNARD JOHN DOUGHERTY, Detective, Gloucester Township Police Department; NICHOLAS C. AUMENDO, Patrolman, Gloucester Township Police Department; DONALD B. GANSKY, Detective Sergeant, Gloucester Township Police Department; WILLIAM DANIEL RAPP, Detective, Gloucester Township Police Department; BRIAN ANTHONY TURCHI, Patrolman, | Hon. Brian R. Martinotti, U.S.D.J.<br>Hon. Tonianne J. Bongiovanni, U.S.M.J.<br><br><br>Docket No. 3:19-cv-19145<br><br><u>CIVIL ACTION</u><br><br>**(ELECTRONICALLY FILED)**<br><br>Motion Return Date: June 15, 2020 |

Gloucester Township Police Department; "JOHN DOE #1" (a fictitious name); and "JOHN DOES 2-10" (fictitious names),

    Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS GURBIR S. GREWAL, JARED M. MAPLES, NEW JERSEY OFFICE OF HOMELAND SECURITY AND PREPAREDNESS, CAMDEN COUNTY PROSECUTOR'S OFFICE, JILL S. MAYER, AND NEVAN SOUMALIS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN LIEU OF ANSWER**

---

Joseph C. Fanaroff
Jeremy M. Feigenbaum
Assistant Attorney General
  Of Counsel and On the Brief

Rachel Simone Frey
Bryan Edward Lucas
Robert McGuire
Deputy Attorneys General
  On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, NJ 07101
Attorney for Defendants Gurbir S. Grewal, Jared M. Maples, New Jersey Office of Homeland Security and Preparedness, Camden County Prosecutor's Office, Jill S. Mayer, and Nevan Soumalis
973-648-7811
Bryan.Lucas@law.njoag.gov

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................... 2

    A. The Extreme Risk Protective Order Act of 2018 ...................................... 2

    B. Plaintiff's Ongoing State Court Proceedings. .......................................... 8

    C. Procedural History ................................................................. 10

STANDARDS OF REVIEW ................................................................. 11

ARGUMENT ................................................................................... 12

    POINT I: THIS COURT SHOULD DISMISS THIS CASE TO ABSTAIN
    FROM INTERFERING IN ONGOING STATE ENFORCEMENT
    PROCEEDINGS. .......................................................................... 12

    POINT II: COUNTS ONE AND THREE FAIL TO STATE A CLAIM ON
    WHICH RELIEF CAN BE GRANTED. ............................................... 20

        A. Fourth Amendment (Count One) ............................................... 20

        B. First Amendment (Count Three) ............................................... 23

    POINT III: ALL CLAIMS FOR MONETARY DAMAGES ARE BARRED
    BY EITHER SOVEREIGN IMMUNITY OR QUALIFIED IMMUNITY .. 26

CONCLUSION ............................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Alden v. Maine*, 527 U.S. 706 (1999) .....................................................................27

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ..............................................................29

*Bowers v. NCAA*, 475 F.3d 524 (3d Cir. 2007).................................................27, 28

*City of San Diego v. Boggess*,
    216 Cal. App. 4th 1494 (Cal. Ct. App. 2014) .....................................................30

*Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .......................................24

*Crespo v. Crespo*, 972 A.2d 1169 (N.J. App. Div. 2009),
    *aff'd* 201 N.J. 207 (2010) ...................................................................................30

*Davis v. Gilchrist Cty. Sheriff's Office*,
    2019 WL 4656070 (Fla. Ct. App. 2019).............................................................30

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2014) .........................................................19

*Gonzalez v. Waterfront Commission of New York Harbor*,
    755 F.3d 176 (3d Cir. 2014)..........................................................................14, 15

*Heges v. United States*, 404 F.3d 744 (3d Cir. 2005)............................................11

*Hope v. State*, 133 A.3d 51 (Conn. 2016).............................................................29

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) ......................................................15

*Imbler v. Pachtman*, 424 U.S. 409 (1976).............................................................28

*Malhan v. Sec'y U.S. Dep't of State*,
    938 F.3d 453 (3d Cir. 2019)................................................................................13

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982)............................................................................................14

*Moore v. Sims,* 442 U.S. 415 (1979) .............................................................15, 17

ii

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) ...............................................................29

*O'Shea v. Twp. of W. Milford*,
    982 A.2d 459 (N.J. App. Div. 2009) ...............................................................22

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*,
    477 U.S. 619 (1986)........................................................................................15

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)..........................................................................................27

*Philips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)............................................................................12

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................................25

*Redington v. State*, 992 N.E.2d 823 (Ind. App. 2013) ...........................................30

*S.M. v. K.M.*, 81 A.3d 723 (N.J. App. Div. 2013).................................................22

*Schrob v. Catterson*, 948 F.2d 1402 (3d Cir. 1991)...............................................29

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ...............................13, 14, 15

*State v. Hemenway*,
    216 A.3d 118 (N.J. 2019)................................................................7, 19, 22, 23

*Sturgeon v. Pharmerica Corp.*,
    2020 WL 586978 (E.D. Pa. 2020)...................................................................24

*Trainor v. Hernandez,* 431 U.S. 434 (1977)...........................................................15

*United States v. Salerno*, 481 U.S. 739 (1987) ......................................................19

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989)..........................................................................................28

*Wisconsin v. Mitchell*, 508 U.S. 47 (1993) ...........................................................25

*Younger v. Harris*, 401 U.S. 37 (1971) ................................................ 13, 14, 17, 18

**Statutes**

N.J. Stat. Ann. § 2C:58-21 .....................................................................15

N.J. Stat. Ann. § 2C:58-23(a) .................................................................. 5

N.J. Stat. Ann § 2C:39-3 ........................................................................ 9

N.J. Stat. Ann. § 2C:58-23 ..................................................................... 1

N.J. Stat. Ann. § 2C:58-23(a) ............................................................15, 16

N.J. Stat. Ann. § 2C:58-23(b)...............................................................16

N.J. Stat. Ann. § 2C:58-23(e)...............................................................4, 19

N.J. Stat. Ann. § 2C:58-23(f)...............................................................6, 17

N.J. Stat. Ann. § 2C:58-23(g)...............................................................4, 17

N.J. Stat. Ann. § 2C:58-24 ..................................................................4, 5, 6

N.J. Stat. Ann. § 2C:58-25 ..................................................................5, 20

N.J. Stat. Ann. § 2C:58-26(b)............................................................... 4

N.J. Stat. Ann. § 2C:58-26(d)............................................................... 5

N.J. Stat. Ann. § 2C:58-29 ..................................................................18

**Other Authorities**

N.J. Court R. 2:2-3(a) ..........................................................................20

## PRELIMINARY STATEMENT

Like sixteen other states, New Jersey has reasonably found that it can protect the public's safety by empowering law enforcement officers to temporarily remove deadly weapons from those who pose an immediate and present danger of harming themselves or others. Under the state's Extreme Risk Protective Order Act of 2018 ("ERPO Act" or "Act"), law enforcement officers and/or an individual's family or household members may seek a state court order to temporarily prevent a specific and dangerous person from, *inter alia*, possessing a firearm. But the Act provides such individuals with a number of substantive and procedural protections, seeking to ensure their rights and to ensure public safety at the same time. Under the Act, a state court can issue an order against a person only if a court makes the finding that the particular individual "poses a significant danger of bodily injury to self or others" by having firearms, N.J. Stat. Ann. § 2C:58-23, and a court can do so only on an emergency, *ex parte* basis if it finds that the specific individual "poses an immediate and present danger of causing bodily injury" by having custody over firearms, *id.*, with a full hearing scheduled shortly thereafter.

In his Complaint, Plaintiff makes a sweeping demand of this Court—to hold the ERPO Act unconstitutional and to prevent law enforcement officers from relying on it. But because such laws protect the public safety and reduce the threat of suicide by removing firearms from persons who may be experiencing moments of crisis, and

1

because such laws protect individual liberties, every court to consider a challenge to similar state laws has turned them away. And this case is a particularly inappropriate context in which to consider these constitutional challenges, because the State has previously initiated a civil enforcement action against Plaintiff in state court for his violations of the Act, at which he can raise the very same claims. That court, rather than this one, should assess—and ultimately reject—Plaintiff's arguments, each of which misunderstand both the applicable law and the state court record.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

A.    *The Extreme Risk Protective Order Act of 2018*.

On June 13, 2018, New Jersey enacted Assembly Bill No. 1217 ("A1217"), known as the "Extreme Risk Protective Order Act of 2018" ("ERPO Act" or "Act"). *See* N.J. Stat. Ann. §§ 2C:58-20 to -32. Derived from the framework and procedures for domestic-violence-prevention orders, the Act allows law enforcement officers or an individual's family or household members to seek an order from a state court to temporarily prevent a specific and dangerous person from, *inter alia*, possessing a firearm. N.J. Stat. Ann. § 2C:58-23. The power to issue such orders is circumscribed. A court may issue a Temporary Extreme Risk Protective Order ("TERPO") only if the officer or family member has shown that this person "poses an *immediate and present danger* of causing bodily injury" to himself or others by having custody over a firearm. *Id.* (emphasis added). And a court may convert that TERPO into a Final

2

Extreme Risk Protective Order ("FERPO") only if—after holding a hearing at which the person has the right to be present, testify, present witnesses, submit information, and cross-examine witnesses—the court finds the person "poses a *significant* danger of bodily injury to self or others by owning, possessing, purchasing, or receiving a firearm." *Id.* (emphasis added).

The procedures governing applications for an ERPO are tailored to the goal of removing guns from dangerous situations. Given the need to act swiftly to address the potential threat to safety—just like the need that exists in the domestic-violence context—a law enforcement officer or family member may file an application for a TERPO on an *ex parte* basis, and the court must resolve it "in an expedited manner." N.J. Stat. Ann. § 2C:58-23. In that proceeding, a court takes evidence regarding the threat that an individual presents, may examine under oath the person who filed the application (referred to as the "petitioner" in the ERPO Act) and witnesses he or she produces, and reviews information produced by the county prosecutor's office. The court must review the evidence to determine whether the individual poses such an "immediate and present danger" of causing bodily injury to himself or others, and, in conducting that analysis, must consider whether the individual (who is identified in the ERPO Act as the "respondent"):

> (1) has any history of threats or acts of violence by the respondent directed toward self or others; (2) has any history of use, attempted use, or threatened use of physical force by the respondent against another person; (3) is the subject of a temporary or final restraining order or has

3

violated a temporary or final restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," P.L.1991, c. 261 (C.2C:25-17 et seq.); (4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the "Sexual Assault Survivor Protection Act of 2015," P.L.2015, c. 147 (C.2C:14-13 et al.); (5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to section 1 of P.L.1992, c. 209 (C.2C:12-10), or domestic violence offense enumerated in section 3 of P.L.1991, c. 261 (C.2C:25-19); (6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals; (7) has any history of drug or alcohol abuse and recovery from this abuse; or (8) has recently acquired a firearm, ammunition, or other deadly weapon.

*Id*. A TERPO "prohibit[s] the respondent from having custody or control of, owning, purchasing, possessing, or receiving firearms or ammunition, and from securing or holding a firearms purchaser identification card or permit to purchase a handgun" while the order is in effect. *Id.* § 2C:58-23(g). The issuance of a TERPO is made on a showing of good cause. *Id.* § 2C:58-23(e). The state court will also issue a search warrant if a TERPO indicates that "the respondent owns or possesses any firearms or ammunition." *Id.* § 2C:58-26(b). In those situations, respondents are directed to surrender their firearms "in a safe manner" to law enforcement. *Id.*

That is just the first step in an ongoing process. If the court issues a TERPO, the court must immediately schedule a hearing where it will decide whether to vacate the TERPO or to convert it into a FERPO within 10 days. N.J. Stat. Ann. § 2C:58-24. The respondent has extensive rights to participate in that hearing, including to testify, present witnesses, submit documents, cross-examine witnesses who appear,

and present information. *See id.*; *see also* ECF 1, Ex. C at 8; ECF 1, Ex. B at 8. The court will grant a FERPO only when it finds, by a preponderance of evidence, that a respondent "poses a significant danger of bodily injury to self or others" by having a firearm. N.J. Stat. Ann. § 2C:58-24. In reaching that conclusion, the court considers all the same factors considered during the TERPO hearing.

Ultimately, even if the court determines to grant a FERPO, that is not the end of the enforcement action: the respondent has a right not only to appeal that decision within 45 days pursuant to N.J. Ct. R. 2:2-3(a)(1), but also to seek termination of the FERPO at any time following its issuance. *See* N.J. Stat. Ann. § 2C:58-25; *see also* ECF 1, Ex. B. at 9. Respondents can have a FERPO terminated whenever they can show, by a preponderance of the evidence, that they no longer present a significant danger of causing bodily injury to themselves or others. N.J. Stat. Ann. § 2C:58-25. On successful termination of a FERPO, the respondent may petition the agency to return the seized firearms or ammunition. *Id.* § 2C:58-26(d).

Law enforcement officers play a critical role in any ERPO application. At the outset, the TERPO petition itself may be filed by a law enforcement officer pursuant to N.J. Stat. Ann. §§ 2C:58-21, -23(a). Moreover, an officer is also required to "take over" any petition presented by a family or household member when: (1) the officer has probable cause to believe that the respondent poses an immediate danger of harm to himself or others on account of his access to firearms, or (2) the officer believes

5

there is some reason the petition would be best filed by law enforcement. ECF 1, Ex. C at 6. Alternatively, law enforcement officers are empowered, in their professional discretion, to take over or join any TERPO petition in any other circumstances. *Id.* When an officer is the petitioner, or where an officer has either taken over or joined a TERPO petition, a prosecutor is required to appear at the FERPO hearing (and the TERPO, if practical) to argue for the petition. *Id.* at 9. Moreover, even if an officer is not party to the proceeding, the prosecutor acts as a "friend of the court" and must still produce, on an expedited basis, all available evidence pertinent to the court's consideration of the ERPO factors. N.J. Stat. Ann. § 2C:58-23(f); ECF 1, Ex. C at 10. The prosecutor's obligation extends not only to the TERPO hearing, *id.*, but also to a FERPO hearing. N.J. Stat. Ann. § 2C:58-24(b). And, of course, beyond playing these roles in these proceedings, law enforcement officers are the ones who execute any search warrants issued during the TERPO and FERPO proceedings.

Before the ERPO Act went into effect on September 1, 2019, the New Jersey Administrative Office of the Courts ("AOC") and Attorney General's Office ("AG's Office") both issued directives to govern its implementation. *See* ECF 1, Ex. C (Law Enforcement Directive 2019-2 (the "AG Directive")); ECF 1, Ex. B (AOC Directive 19-19 (the "AOC Directive")). The directives offered the authoritative interpretation of both AOC and the AG's Office regarding how judges and law enforcement must operate under the law. As relevant here, the directives addressed whether and when

search warrants may be requested and may issue under the ERPO Act. Although the statute said that TERPOs and FERPOs may issue whenever "good cause" exists to believe that a person presents a threat of self-harm or harm to others—the language used for similar domestic violence orders under the state's Prevention of Domestic Violence Act ("PDVA")—the AOC and the AG's Office both made clear that good cause is *not* sufficient to support a search warrant under the ERPO Act. *See* ECF 1, Ex. B, Guideline 4(e) (AOC Directive); Ex. C at 5 (AG Directive).[1]

There was a good reason for that change. Although the PDVA uses the same "good cause" language found in the ERPO Act, the New Jersey Supreme Court had recently held—after passage of the ERPO Act, but before its effective date—that a search warrant under the PDVA had to be supported by probable cause to comply with the federal and state constitutions. *See State v. Hemenway*, 216 A.3d 118, 121 (N.J. 2019). The AOC and AG's office therefore found that the same rule applied to the ERPO Act—meaning that officers may only seek, and courts may only issue, such warrants for firearms when "the court determines that *probable cause* exists to believe that: (1) the respondent owns or possesses any firearms or ammunition, (2) the respondent poses an immediate and present danger of bodily injury to self or

---

[1] The AG's Directive clarifies that in situations when law enforcement only has good cause, but not probable cause, to believe that a respondent "poses an immediate and present danger of causing bodily injury to self or others," the officer can seek a TERPO, but the officer may *not* seek a warrant. ECF 1, Ex. C at 5.

7

others by owning or possessing any such firearms or ammunition, and (3) such firearms or ammunition are presently at a specifically described location." ECF 1, Ex. B, Guideline 4(e); Ex. C at 5 (emphasis added).

B.  *Plaintiff's Ongoing State Court Proceedings.*

On September 5, 2019, days after the Act became effective, a law enforcement officer with the Office of Homeland Security and Preparedness ("OHSP") sought a TERPO against Plaintiff in the Superior Court, Camden Vicinage, Criminal Part. *See* ECF 1, Exhibit D (Sept. 5, 2019 TERPO Petition). As OHSP explained, the Petition resulted from a law enforcement investigation into the threat Plaintiff posed to others, in particular to Jewish people:

> Information was recently obtained, through FBI contacts, that David Greco is involved in online anti-Semitism. Greco was found to be in contact with the Pittsburgh synagogue shooter, before the mass shooting took place in October 2018. After the recent August 2019 mass shootings in both Ohio and El Paso, precautions were taken and contact was made with Greco. In coordination with the FBI, officers reached out to Greco in regards to recent posts on the social media site Gab.com. All previous social media accounts were blocked due to the nature of the content. While talking to Greco, he appeared extremely intelligent to officers and did not mention acting on any violent behavior towards Jews. His behavior was methodical and focused on facts, specifically from Nazi Germany. Greco believes that force or violence is necessary to realign society. Greco frequently mentioned his disdained [sic] for the Jewish Talmud and how he believes that Jews are raping our women and children.

*Id.* The Petition included information about Greco's "prior arrests, pending charges, or convictions for a violent indictable offense or disorderly persons offense"—*i.e.*,

8

a violation of a state law prohibiting the carrying of a prohibited weapon, N.J. Stat. Ann § 2C:39-3—and several prior drug-related offenses. The petition included video recorded by a law enforcement officer during an interview of Greco on August 5, 2019, along with reports from the Federal Bureau of Investigation ("FBI") and the Gloucester Township Police Department ("GTPD"). *See* ECF 1, Ex. E.

The following day, Judge Edward McBride held a hearing on the petition and issued the TERPO. *Id.* In rendering his ruling, Judge McBride considered testimony from an OHSP agent, reports from the FBI and GTPD, and Plaintiff's own "history of threats or acts of violence … directed toward self or others." *Id.* The court found that Plaintiff has "threatened, advocated, and celebrated the killing of Jewish people and has celebrated the mass shooting in Pittsburgh and New Zealand"; highlighted Plaintiff's "attempts to avoid contact with law enforcement" and "glorification of extreme violence against Jewish people even after encounter with investigators"; described how Plaintiff "refused to answer the door when law enforcement officers went to the home to speak with respondent, and the officers were able to speak [to him] only after his parents arrived at the home and allowed the officers inside and summoned the respondent upstairs"; noted that Plaintiff "was extremely agitated and angry during the encounter with law enforcement"; emphasized instances in which Plaintiff showed his "hostile demeanor"; and added that there is "credible evidence, through both records checks and confirmation with a member of respondent's

household, that respondent possess [sic] firearms at his residence, consisting of at least one handgun and one rifle." *Id.*

At the same time, the court issued a search warrant for Plaintiff's home based on the court's finding of "probable cause" that "(1) [Plaintiff] owns or possesses firearms or ammunition as described below, (2) [he] poses an immediate and present danger of bodily injury to self or others by owning or possessing any such firearms or ammunition, and (3) such firearms or ammunition are presently at the location described below." *Id.* The TERPO and search warrant were served on Plaintiff on September 6, 2019. *Id.* The search warrant advised Plaintiff of a FERPO hearing on September 11, 2019. *Id.* Pursuant to the warrant, law enforcement ultimately seized a rifle, rifle ammunition, and Plaintiff's Firearms Purchaser ID card. ECF 1 ¶54.

The FERPO hearing scheduled for September 11, 2019, has been adjourned several times and a date for the FERPO remains pending.[2]

C.   *Procedural History*

Plaintiff filed the instant complaint on October 21, 2019, alleging the ERPO Act violates the First, Second, and Fourth Amendments, and seeking both injunctive relief and monetary damages. ECF No. 1. He also moved for preliminary injunctive

---

[2] Notably, Plaintiff's counsel has refused to allow Defendants to introduce evidence regarding whether Plaintiff sought those extensions and/or why the FERPO hearing was postponed for months—along with any other evidence from the ongoing ERPO proceedings in state court.

relief. *Id.* On November 8, 2019, Defendants opposed that motion. ECF No. 32. The Court heard argument on November 20, 2019, ECF No. 39, and denied the motion on February 21, 2020. ECF No. 57.

Defendants now move to dismiss Plaintiff's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(1), and to dismiss Counts One and Three of Plaintiff's complaint pursuant to Rule 12(b)(6).

## STANDARDS OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(1) challenges the federal court's subject matter jurisdiction. The plaintiff bears the burden of persuasion. *See Heges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In considering a 12(b)(1) motion, a "court may not presume the truthfulness of plaintiff's allegations, but rather must 'evaluat[e] for itself the merits of [the] jurisdictional claims.'" *Id*.

Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. The courts must accept as true the factual allegations in the complaint and construe any inferences to be drawn from those allegations in Plaintiff's favor. *See Philips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). But threadbare allegations will not be sufficient; to survive a motion to dismiss, the claims must be plausible.

**ARGUMENT**

**POINT I**

**THIS COURT SHOULD DISMISS THIS CASE TO ABSTAIN FROM INTERFERING IN ONGOING STATE ENFORCEMENT PROCEEDINGS.**

This Court should abstain from hearing this case. Although the federal courts typically hear and decide any case over which they have jurisdiction, the Supreme Court has for decades recognized a "far-from-novel" exception to that rule, known as *Younger* abstention, which "requires federal courts to abstain from deciding cases that would interfere with certain ongoing state proceedings." *Malhan v. Sec'y U.S. Dep't of State,* 938 F.3d 453, 462 (3d Cir. 2019).

The purpose of this rule, announced in *Younger v. Harris*, 401 U.S. 37 (1971), is "[t]o promote comity between the national and state governments." *Malhan,* 938 F.3d at 462. With that aim in mind, the Supreme Court identified three circumstances in which *Younger* abstention governs—where there are "(1) ongoing state criminal prosecutions; (2) [pending] certain civil enforcement proceedings; and (3) pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78-79 (2013)). If any one of these categories apply, then the court assesses and weighs three more factors—whether "(1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important

state interests; and (3) the state proceedings afford an adequate opportunity to raise federal claims." *Id.* (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). If a case satisfies those requirements, the federal court must abstain in favor of the ongoing state proceeding.

*Younger* abstention applies here because there is a pending civil enforcement proceeding that requires this Court to stay its hand. As the Supreme Court has put it, although *Younger* developed in a criminal context, it applies to any civil enforcement proceedings that are "akin to a criminal prosecution" in "important respects." *Sprint*, 571 U.S. at 79; *see also Gonzalez v. Waterfront Commission of New York Harbor*, 755 F.3d 176, 181 (3d Cir. 2014) (same). The Supreme Court and the Third Circuit have helpfully explained "that quasi-criminal proceedings of this ilk share several distinguishing features"—namely, that "a state actor is routinely a party to the state proceeding and often initiates the action," that such cases "often begin with internal investigations that 'culminat[e] in the filing of a formal complaint or charges,'" and that these cases "are characteristically initiated to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act." *Gonzalez*, 755 F.3d at 181 (quoting *Sprint*, 571 U.S. at 79). The Supreme Court has held that abstention can be triggered by a wide array of "state-initiated administrative proceedings," like those seeking to "enforce state civil rights laws," "gain custody of children allegedly abused by their parents," "recover welfare payments," and "enforce obscenity laws."

13

*Sprint*, 571 U.S. at 80-81 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619 (1986); *Moore v. Sims,* 442 U.S. 415 (1979); *Trainor v. Hernandez,* 431 U.S. 434 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975)). And the Third Circuit has even abstained in light of pending disciplinary proceedings by a waterfront commission against its employee. *See Gonzalez*, 755 F.3d at 185.

Proceedings under the ERPO Act are the kind of civil enforcement suits that require abstention, because all three of the hallmarks the Supreme Court and Third Circuit described are present. There can be little doubt that "a state actor is routinely a party to the state proceeding and often initiates the action." *Gonzalez*, 755 F.3d at 181. The Act establishes that petitions will regularly be filed by law enforcement officers, *see* N.J. Stat. Ann. §§ 2C:58-21, -23(a), which is what happened here. The Act also makes clear that law enforcement officers have a duty to take over or join in any petition filed by a family or household member when the officer has probable cause to believe the TERPO standard is met—and the Act further clarifies that law enforcement officers may take over petitions in other cases as well. And when a law enforcement officer files, takes over, or joins a TERPO petition, a county prosecutor is required to appear at the TERPO or FERPO hearing to argue for the petition. Even when law enforcement is not the filing party, the prosecutor must act as a "friend of the court" and produce to the court, on an expedited basis, any available evidence

14

pertinent to the state court's consideration of the ERPO factors.[3] It is impossible to separate the role of state actors from the ERPO process.

The other criteria for a civil enforcement proceeding are similarly satisfied. As for whether there was any investigation predating the initiation of the proceeding, the ERPO Act demands submission of an affidavit by law enforcement "setting forth the facts tending to establish the grounds of the petition, or the reason for believing that they exist, and, to the extent available, the number, types, physical description, and locations of any firearms and ammunition currently believed by the petitioner to be controlled or possessed by the respondent"—which can come only from a pre-initiation investigation. *See* N.J. Stat. Ann. § 2C:58-23(a)-(b). The Act also requires that the prosecutors produce available evidence they have relating to the respondent, including that individual's "history of threats or acts of violence," "history of use, attempted use, or threatened use of physical force," "prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense[,] or domestic violence offense," and "history of drug or alcohol abuse and recovery," and to identify whether the individual "has recently acquired a firearm,

---

[3] As extensive as they are, these are actually only a few of the examples of the ways in which state actors are involved in ERPO proceedings. Although the Act allows a family or household member to file a petition, the law permits the submission of that petition to a court *or a law enforcement agency*. N.J. Stat. Ann. § 2C:58-23(a). The Act also directs New Jersey "law enforcement agenc[ies]" to "advise" lay petitioners regarding the procedures for filling out a petition and sets forth that they "may assist" lay petitioners in "preparing or filing the petition." *Id.*

ammunition, or other deadly weapon." N.J. Stat. Ann. § 2C:58-23(f). That kind of information likewise plainly comes from an investigation.[4]

Finally, the EPRO Act involves imposition of a "sanction" as the term has been understood for purposes of *Younger* abstention. The statute requires the court—after hearing from officers and reviewing information provided by a prosecutor—to decide whether that person in fact poses a sufficient threat of "immediate and present danger of causing bodily injury to self or others" (TERPO) or "significant danger of bodily injury to self or others" (FERPO). In response to the threat, the court prohibits that individual from "having custody or control of, owning, purchasing, possessing, or receiving firearms or ammunition," and requires him to "surrender firearms and ammunition in the respondent's custody or control," until the threat has abated. *See* N.J. Stat. Ann. § 2C:58-23(g). Just as the *Younger* abstention doctrine applies to a proceeding designed to gain custody and protect children allegedly abused by their parents, *Moore,* 442 U.S. at 420, so too does it apply to proceedings to temporarily remove firearms from an individual found to pose a threat to himself or others. Said another way, this is a quintessential case in which a court must inquire into conduct (whether an individual poses a certain level of danger to self or others) and then issue an ameliorative order to address it (separating firearms from the danger).

---

[4] Indeed, the petition and the TERPO in this case—which Plaintiff attached to his Complaint—demonstrate that an investigation preceded OHSP's filing, and as part of the investigation, officers even interviewed Plaintiff. *See* ECF 1, Exs. D & E.

All three of the Court's hallmarks are thus satisfied, especially understood in light of the goal of the inquiry—to identify which civil enforcement proceedings are sufficiently akin to criminal ones. In many respects, the ERPO proceeding is closer to a quasi-criminal action than other civil proceedings in which abstention has been applied. The actors charged with enforcing the Act by filing and/or participating in TERPO and FERPO proceedings are law enforcement officers and prosecutors—the quintessential state actors in criminal cases. (Indeed, the defendants in this federal case include a number of law enforcement agencies and officers, including a county prosecutor.) Moreover, the information to be considered in an ERPO proceeding is the kind of law enforcement sensitive information that arises in criminal contexts— including prior arrests and pending criminal charges. And even after the proceeding, law enforcement officers are the ones who will implement any warrant to search for and collect the firearm. No wonder, then, that the ERPO Act is housed in the state's criminal code; that the proceedings occur in the Criminal Part; and that violations of ERPOs are "offenses," N.J. Stat. Ann. § 2C:58-29.[5] In light of the ways that these proceedings mimic criminal ones, *Younger* abstention clearly applies.

The three additional factors this Court must consider are similarly satisfied. First, there clearly are ongoing state judicial proceedings: the complaint establishes

---

[5] Any person who either "purposely or knowingly violates" such an ERPO "is guilty of a crime of the fourth degree," N.J. Stat. Ann. § 2C:29-9(e), punishable by up to eighteen months in prison, N.J. Stat. Ann. § 2C:43-6(a)(4)

that proceedings were commenced in the New Jersey Superior Court, *see* ECF No. 1 at ¶¶ 41-55, and the state court continues holding status conferences, with the next scheduled for June 15, 2020. Second, the judicial proceedings implicate critical state interests: the ERPO Act seeks to protect the State's residents from the threat of injury at the hands of a person found to present an immediate and present danger. *See* N.J. Stat. Ann. § 2C:58-23(e); *see also, e.g., Drake v. Filko*, 724 F.3d 426, 437 (3d Cir. 2014) (noting "New Jersey has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety," including in particular from the threat of misuse of firearms); *United States v. Salerno*, 481 U.S. 739, 755 (1987) (confirming that "primary concern of every government" is "concern for the safety and indeed the lives of its citizens"). As for the third factor—*i.e.,* whether the court proceedings afford an adequate opportunity for Plaintiff to raise his claims—it is undeniable that Plaintiff can argue to the state courts that the ERPO Act is unconstitutional, both at his FERPO hearing and on appeal.[6] Indeed, as this Court correctly held, "the ERPO Act allows Plaintiff to seek the return of his property at a FERPO hearing where he would be permitted to raise constitutional arguments." *See* ECF No. 57 at 15; *id.* at 21 (making the same point regarding due process claim); *see also, e.g.*, N.J. Court

---

[6] *State v. Hemenway*—on which Plaintiff relies for his Fourth Amendment claims— proves this point. There, as here, a person challenged a provision of the PDVA that allowed for warrants to be issued on "good cause." 216 A.3d at 128. Hemenway pursued his challenge before the Appellate Division and the Supreme Court. Plaintiff could proceed similarly in pursuing his challenge to the ERPO Act.

R. 2:2-3(a); N.J. Stat. Ann. § 2C:58-25. Plaintiff can and should raise all of his claims in his ongoing state court proceeding—not in federal court.

The procedural history of this particular case only emphasizes the importance of abstention. As this Court has already recognized, Plaintiff's complaint and legal papers have included a series of factual allegations about what transpired in his state court proceedings, but at the same time he has steadfastly refused to allow this Court to review the state-court record. Although Plaintiff asserts that the warrant issued in his case relied on a standard less than probable cause, his refusal to allow this Court to review any records from the state court TERPO hearing "effectively prevent[ed] this Court from analyzing Plaintiff's own claim that a standard lesser than probable cause was used." *Id*. at 14. Indeed, the evidence before the Court proves the opposite. *See id.* at 14-15 (noting that, "based on the record before the Court, the warrant for Plaintiff's rifle and ammunition was issued upon a finding of probable cause"). The same is true for the First Amendment claim; this Court already found that Plaintiff's claims were simply not borne out by the materials he introduced. *See* ECF No. 57 at 22 (finding that "the record before the court has not established that Plaintiff's rifle and ammunition were seized because of the *opinions* he expressed"). Ultimately, this confirms the need to abstain: rather than issuing rulings that will affect the ongoing state court rulings based on limited information, the proper course is to let the state

court resolve the entire case—including constitutional challenges that can and likely will be raised before that court—based on the full record before it.

Because the State has shown that the prerequisites for abstention are met, and because abstention is in accord with judicial economy and common sense, this Court should abstain from considering this case.

## POINT II

### COUNTS ONE AND THREE FAIL TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

Even if this Court determines that it will not abstain, Counts One and Three of the complaint must still be dismissed because Plaintiff has not asserted any claim upon which relief can be granted. Plaintiff's Fourth Amendment claim fails because, as this Court found, the warrant issued in this case was based on the constitutionally-sufficient probable cause standard, and Plaintiff's rights were not violated. His First Amendment claim likewise fails because the ERPO Act in no way regulates speech, and because Plaintiff has not sufficiently alleged that the TERPO and seizure of his firearms resulted from any interference with his protected speech.

A.    Fourth Amendment (Count One)

Plaintiff's Fourth Amendment claim fails as a matter of law. Plaintiff's claim rests on two pillars: first, that a search warrant may not issue under the ERPO Act under any standard less than "probable cause," and second, that the warrant issued in his state court proceedings relied only on "good cause" instead of probable cause.

20

This Court need not address the first argument, however, because the materials Plaintiff himself supplied—which are appropriate for consideration at this stage of the case—reveal that the state court in fact properly employed the probable cause standard. It follows that Plaintiff has failed to state a plausible Fourth Amendment claim.

As this Court has already held, Plaintiff's Fourth Amendment claim rests on a misunderstanding. Plaintiff dedicates most of his papers to the ERPO Act's text, which allows courts to issue search warrants based on a showing of "good cause" in conjunction with a TERPO. *See* ECF 1 ¶¶62-64. But that tells only part of the story. After passage of the ERPO Act—but before it took effect—the New Jersey Supreme Court decided *State v. Hemenway*, a case involving a similar challenge to a provision of the PDVA that allowed for the issuance of warrants on good cause, and held that such warrants nevertheless required a showing of probable cause. *See* 216 A.3d 118 at 121; ECF No. 57 at 4 n.6. In light of *Hemenway*, both AOC and Attorney General Grewal issued directives confirming that the "*probable cause standard* determines whether a search warrant can be issued" under the ERPO Act, too. ECF No. 57 at 4 (emphasis added); ECF 1, Ex. B, Guideline 4(e); ECF 1, Ex. At 5. As this Court has already explained, the directives resolve Plaintiff's concerns and "have the force of law" in New Jersey. *See* ECF No. 57 at 4 nn. 3 & 4 (citing *S.M. v. K.M.*, 81 A.3d 723, 728 n.2 (N.J. App. Div. 2013); *see also O'Shea v. Twp. of W. Milford*, 982 A.2d

21

459, 465–466 (N.J. App. Div. 2009)). Probable cause is thus the established standard for New Jersey courts and New Jersey law enforcement, and so the ERPO Act, "as it is currently being enforced, is constitutional." *See* ECF No. 57 at 23 n.18.[7]

Most importantly, the judge in Plaintiff's state TERPO proceeding employed the proper standard. As the State explained in its brief in opposition to a preliminary injunction, the warrant Judge McBride issued explicitly said that he "determine[d] that *probable cause* exists to believe that" Plaintiff poses an immediate and present danger of bodily injury to self or others, that Plaintiff owns or possesses firearms, and that such firearms are presently at a specifically described location. ECF 1, Ex. E (emphasis added). And that is exactly what this Court has found. *See* ECF No. 57 at 14-15 ("[B]ased on the record before the Court, the warrant for Plaintiff's rifle and ammunition *was issued upon a finding of probable cause*, and as such, the warrant was issued in a constitutional manner.") (emphasis added). Nor is there any issue with considering that warrant at the motion-to-dismiss stage, both because the warrant was "integral to" the Fourth Amendment claim and was "explicitly relied

---

[7] Although this Court did note that the AOC and AG Directives "can be rescinded or altered in a similar summary manner to which they were promulgated," *id.*, that is of no moment. The issue here is whether there is a current violation of the Fourth Amendment. There is not. The mere fact that a directive—like a regulation or even a statute—can be amended does not change that calculus. If the Attorney General or AOC withdraw or amend their directives, a plaintiff will always remain free to file a challenge to any search warrant subsequently issued on "good cause," and to make any arguments based on *Hemenway* at that time.

on in the complaint," *see Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), and because it is part of a state-court record of which this Court may take notice, *see Sturgeon v. Pharmerica Corp.*, 2020 WL 586978 at *4 (E.D. Pa. 2020) ("publicly available records from other judicial proceedings may be judicially noticed in the context of a motion to dismiss"). This disposes of this claim: Plaintiff says a warrant must be based on probable cause—and his warrant was. Plaintiff has thus failed to state any claim on which relief can be granted.[8]

### B.   First Amendment (Count Three)

Plaintiff's First Amendment claim likewise warrants dismissal. On its face, the ERPO Act does not restrict speech at all. The law says only that individuals who present a significant danger of bodily injury to self or others by having firearms can be temporarily dispossessed of those weapons by court order. Legal consequences, in other words, flow from the *danger* an individual poses, not as a punishment for

---

[8] For the same reasons, the State reiterates its argument that Plaintiff lacks standing to pursue his Fourth Amendment claim. In order to have standing, Plaintiff needs to allege an injury this Court can redress. But the requested relief—a rule that the State can only issue and enforce search warrants if there has been a showing of "probable cause"—would redress nothing, as the search warrant issued for Plaintiff's firearms *was* based on probable cause. *See* ECF No. 32 at 24-30 (in opposition to preliminary injunction, arguing Plaintiff lacks standing to pursue claim). At a minimum, even if this Court believes that Plaintiff has standing, there is still no basis to grant him any permanent injunctive relief on this claim for the same reason that there was no basis to grant him preliminary relief—the lack of harm. *See* ECF No. 57 at 13-16 (noting, for these very reasons, Plaintiff's lack of harm).

his or her protected speech (or for speech of any kind). Because the law has nothing to do with speech, the First Amendment is no obstacle.

That an individual's speech can be *evidence* of the threat that he poses others does not change this analysis. The distinction between a direct prohibition on speech and the use of protected speech as evidence is critical and commonplace under the law. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment … does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992) (noting speech "can be swept up incidentally within the reach of a statute directed at conduct rather than speech"). Congress could not enact a law putting individuals in jail for using sexist language without violating the First Amendment. But that same speech can be offered as evidence of sex-based discrimination in hiring, promotions, and the like. *See Mitchell*, 508 U.S. at 490. The same is true in the criminal law—an individual cannot be put in jail for engaging in protected speech, but their anti-gay speech can be evidence of a motive to commit a crime of which they are charged, including a hate-crimes charge. *See id.* at 489 (noting "[e]vidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability and the like.").[9] So, too, under

---

[9] In *Mitchell*, the plaintiff argued that a Wisconsin law increasing the sentence for racially-motivated aggravated battery violated the First Amendment by effectively punishing bigoted thought. 508 U.S. at 479-82. The Court rejected that argument

this Act; no one may be punished for their speech, but the threats an individual made can be part of the collective evidence regarding the danger he poses to others.

To make out a First Amendment claim, then, Plaintiff must sufficiently allege facts to show that the TERPO and warrant issued in *his* case constituted punishment for protected speech under the First Amendment. As this Court has already held, he has failed to do so. Although Plaintiff includes conclusory and threadbare allegations that his guns were seized based upon his "opinion and speech," ECF 1 at ¶ 70, such statements fail to clear the line of plausibility—the complaint "offers no details as to the what specific instances of speech he is claiming the TERPO is impermissibly punishing him for," and Plaintiff refused to provide to this Court "records from the TERPO hearing, including transcripts, exhibits, and other evidence Judge McBride considered when issuing his ruling." ECF 57 at 22. Still more, the materials Plaintiff provided along with his complaint "ha[ve] not established that Plaintiff's rifle and ammunition were seized because of the *opinions* he expressed." *Id.* Instead, "exhibits to Plaintiff's own Complaint"—which may be considered because Plaintiff relies on them, because they are integral to his claims, and because they are part of a judicial record—confirm that "Judge McBride considered not only Plaintiff's social media posts, but also Plaintiff's 'history of threats or acts of violence directed toward self

---

because, *inter alia*, it found the penalty enhancement was content-neutral. *Id.* at 487. The Court found that the *conduct* targeted—namely, assault motivated by bias—was not protected by the First Amendment. The same analysis applies here.

or others.'" *Id.*[10] There are thus no plausible allegations to suggest "that Plaintiff was

penalized because of his lawful speech," *id.*, and the materials Plaintiff himself

included disprove his allegations.

## POINT III

### ALL CLAIMS FOR MONETARY DAMAGES ARE BARRED BY EITHER SOVEREIGN IMMUNITY OR QUALIFIED IMMUNITY.

Even assuming that Plaintiff states a claim, his claims for monetary damages

are independently barred by sovereign immunity and qualified immunity.

Plaintiff's claims for money damages against the state entities and against the

defendants sued in their official capacities violate bedrock principles of sovereign

immunity. States cannot be haled into federal court—absent their consent—to face

a money-damages claim. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 100 (1984); *Alden v. Maine*, 527 U.S. 706, 713 (1999). That rule, of course,

applies to any "entities that are considered arms of the state." *Bowers v. NCAA*, 475

F.3d 524, 545 (3d Cir. 2007) (citations omitted). A state entity is considered an arm

---

[10] Indeed, Judge McBride considered a range of evidence when determining whether to issue a TERPO, including that Plaintiff "has been the subject of complaints of aggressive driving and hostile demeanor in connection with his employment as a driver of school mini-buses;" that Plaintiff was agitated and angry when dealing with law enforcement; and posts in which he "threatened, advocated, and celebrated the killing of Jewish people and has celebrated the mass shootings in Pittsburgh and New Zealand." ECF 1, Ex. E. The judge also noted Greco had been arrested twice for offenses relating to narcotics. *Id.*

of the state "when a judgment against it would have essentially the same practical consequences as a judgment against the State itself." *Id.* at 545-46. Said another way, sovereign immunity bars a claim for damages whenever the state is "the real party in interest." *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989). "[T]o determine whether an entity is an arm of the state," the Third Circuit applies a "three-part test" first adopted in *Fitchik* : "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Bowers,* 475 F.3d at 546. Here, the claims against the state entities and the defendants sued in their official capacities— where a recovery necessarily comes from state coffers, and where the state officials are acting as the state itself—plainly cannot proceed.[11]

To the degree that Defendants Mayer and Soumilas are sued in their individual capacities (and Plaintiff's complaint is not clear on this point), qualified immunity bars those money damages claims from moving forward, too.[12] After all, "[q]ualified

---

[11] In the same way, to be liable within the meaning of § 1983, a defendant must be a "person" under that statute. But "[s]tates," "governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," and "officials acting in their official capacities" are not considered "persons" amenable to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). For the same reason, too, Plaintiff's money damages claim is not cognizable under § 1983.

[12] These Defendants also possess absolute prosecutorial immunity from Plaintiff's claims for money damages. *See Imbler v. Pachtman*, 424 U.S. 409, 427-28 (1976). Although no court has directly addressed whether ERPO Act proceedings fall within the ambit of this immunity, the Third Circuit has held that other quasi-criminal civil

immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing that: (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (noting that this analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition"). As this brief establishes, Plaintiff has failed to plead any facts demonstrating a violation of his constitutional rights, and certainly has not demonstrated that a defendant has engaged in conduct that was "clearly established" to be unlawful. Plaintiff cannot identify a single case that clearly put Defendants on notice that their alleged conduct was unlawful.

Although the State focused only on Counts One and Three (regarding the First and Fourth Amendments) in the Rule 12(b)(6) portion of its motion to dismiss, this Court can still determine that Defendants Mayer and Soumilas have not violated any "clearly established" right under the Second Amendment. For one, both Mayer and Soumilas were enforcing the ERPO Act according to its terms, and Plaintiff does not allege otherwise. For another, every court to consider a similar challenge has held that states are free to enact such careful and circumscribed statutes. *See, e.g., Hope v. State*, 133 A.3d 519, 524-25 (Conn. 2016) (upholding law permitting seizure of

---

proceedings do. *See, e.g.*, *Schrob v. Catterson*, 948 F.2d 1402, 1417 (3d Cir. 1991) (applying absolute prosecutorial immunity to civil forfeiture proceedings).

firearms from any individuals deemed to pose "a risk of imminent personal injury to self or others"); *Redington v. State*, 992 N.E.2d 823, 829-30, 833-35 (Ind. App. 2013) (upholding law permitting seizure of firearms from persons found to "present an imminent risk of personal injury to the individual or to another … or may present a risk of personal injury to the individual or to another … in the future"); *City of San Diego v. Boggess*, 216 Cal. App. 4th 1494, 1500 (Cal. Ct. App. 2014) (upholding law permitting seizure "and possible forfeiture of weapons belonging to persons" detained for mental health evaluations); *Davis v. Gilchrist Cty. Sheriff's Office*, 2019 WL 4656070 (Fla. Ct. App. 2019) (upholding law that permitted seizure of firearms from those individuals "who pose a significant danger to themselves or others"); accord *Crespo v. Crespo*, 972 A.2d 1169, 1178-79 (N.J. App. Div. 2009), *aff'd* 201 N.J. 207, 209 (2010) (reaching the same conclusion under statute that dispossesses domestic abusers of weapons). Plaintiff has not identified a single case suggesting it is unconstitutional to temporarily limit firearm possession by those persons found to pose a "significant danger" of causing injury to themselves or others.

## CONCLUSION

For these reasons, this Court should dismiss this complaint with prejudice.

Dated: May 11, 2020                    Respectfully Submitted,

                                       GURBIR S. GREWAL
                                       ATTORNEY GENERAL OF NEW JERSEY

                                       By: /s/ Bryan Edward Lucas

                                       Joseph C. Fanaroff
                                       Jeremy M. Feigenbaum
                                       Assistant Attorneys General
                                          Of Counsel and On the Brief

                                       Rachel Simone Frey
                                       Bryan Edward Lucas
                                       Robert McGuire
                                       Deputy Attorneys General
                                          On the Brief